UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CSX TRANSPORTATION, INC., | ) |
| *Plaintiff,* | ) ) ) |
| | ) No. 1:21-cv-02859-JMS-MJD |
| *vs.* | ) ) |
| ZAYO GROUP, LLC, | ) ) |
| *Defendant.* | ) ) |

# ORDER

Plaintiff CSX Transportation, Inc. ("CSXT") initiated this matter alleging that Defendant Zayo Group, LLC ("Zayo") installed a fiber optic network system that damaged CSXT's property. This Order discusses Zayo's Motion to Exclude Expert Opinions of Alex R. Saar, [Filing No. 548]; Zayo's Motion to Strike Plaintiff's Opposition to Zayo's Motion to Exclude Alex Saar, P.E.'s Expert Testimony, [Filing No. 565]; and CSXT's Motion to Substitute Brief, [Filing No. 573].

## I.
### MISCELLANEOUS MOTIONS

The Court first discusses Zayo's Motion to Strike Plaintiff's Opposition to Zayo's Motion to Exclude Alex Saar, P.E.'s Expert Testimony, [Filing No. 565], and CSXT's Motion to Substitute Brief, [Filing No. 573].

In response to Zayo's Motion to Exclude, CSXT filed a 27-page response brief. [Filing No. 550.] The Court's Practices and Procedures docketed in this case on November 18, 2021 do not provide for a page limit for briefs related to motions other than those for summary judgment, [Filing No. 10], but the Court's current Practices and Procedures – available on the Court's website – state that for motions other than those for summary judgment, "supporting and response briefs

(excluding tables of contents, tables of authorities, appendices, and certificates of services) may not exceed **20 pages** and reply briefs may not exceed **10 pages**, absent leave of Court and notwithstanding Local Rule 7-1(e)." https://www.insd.uscourts.gov/sites/insd/files/JMS%20PRACTICES%20AND%20PROCEDURES.pdf (emphasis in original) (last visited April 22, 2024). Based on this 20-page limit, Zayo filed a Motion to Strike Plaintiff's Opposition to Zayo's Motion to Exclude Alex Saar, P.E.'s Expert Testimony since it is seven pages above the 20-page limit. [Filing No. 565.]

In response to Zayo's Motion to Strike, CSXT filed a Motion to Substitute Brief in which it seeks to substitute its response brief with a version that complies with the 20-page limit. [Filing No. 573.] CSXT states that its failure to comply with the 20-page limit "was an oversight and was not the result of any intentional disregarding of the Court's Practices and Procedures Document," and that it did not add any text to the proposed substitute brief but "only removed text," so there is no prejudice to Zayo in allowing the substitution. [Filing No. 573 at 2.]

Zayo opposes CSXT's request to substitute its response brief, arguing that CSXT "made substantive edits to argument on 16 pages of its original brief in order to meet the Court's page limit requirement," that CSXT filed its substitute brief after Zayo filed its reply, "giving [CSXT] unfair opportunity to reconfigure its arguments in Opposition," and that "it would be unduly burdensome (and unrealistic) for Zayo or this Court to parse through [CSXT's] replacement brief to determine what edits were truly 'cuts' to their original arguments versus edits that were tailored based on Zayo's arguments in its Reply." [Filing No. 575 at 2 (emphasis omitted).]

The Court acknowledges that CSXT's response brief does not comply with the Court's current Practices and Procedures, but also notes that the Practices and Procedures docketed in this case back in November 2021, when this case was in its infancy, do not provide for a 20-page limit

for response briefs. [*See* Filing No. 10.] While counsel should keep apprised of the Court's Practices and Procedures and CSXT does not purport to have relied on the docketed version of the Practices and Procedures, the Court still recognizes that this could have caused some confusion.

Additionally, a review of CSXT's red-lined version of its substitute brief indicates that CSXT deleted material from its original brief but did not add any material. [*See* Filing No. 573-2.] It is true that CSXT made those changes with the benefit of seeing Zayo's reply brief first, but the Court finds that Zayo will not suffer any prejudice by the Court considering CSXT's substitute brief.

Accordingly, the Court **DENIES** Zayo's Motion to Strike Plaintiff's Opposition to Zayo's Motion to Exclude Alex Saar, P.E.'s Expert Testimony, [Filing No. 565], and **GRANTS** CSXT's Motion to Substitute Brief, [Filing No. 573]. The Court will consider CSXT's substitute response brief at Filing No. 573-1 instead of its original response brief at Filing No. 550 in connection with Zayo's Motion to Exclude Expert Opinions of Alex R. Saar.

## II.
### MOTION TO EXCLUDE

**A. Applicable Law**

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702, which was amended effective December 1, 2023, provides that expert testimony is admissible if "the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the

case." Fed. R. Evid. 702. While "[n]othing in the amendment imposes any new, specific procedures," the Committee Notes reflect that the purpose of the amendment was to clarify and emphasize: (1) the applicability of the "preponderance of the evidence standard," that is, that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in [Rule 702]"; and (2) that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 Advisory Comm. Notes, 2023 Amendments.

A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue….  Many factors will bear on the inquiry." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).  The Court has a "gatekeeping obligation" under Rule 702 and "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).  The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert

testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). Given the amendments to Rule 702, the Court must also determine whether the proponent has made the requisite showing under the "more likely than not" standard.

  **B.**  **Summary of Mr. Saar's Opinion**

Mr. Saar is a Senior Manager of Corridor Services for CSXT and is "responsible for managing a team of engineers who review all new and existing third-party utility permitting requests across more than twenty-six…states and twenty-one thousand…miles of track." [Filing No. 548-1 at 4.] His responsibilities also include "engineering review, sales and marketing, contract preparation, real estate research, contract negotiating, and engineering during construction," and "coordinating utility relocations for all CSXT capital construction projects." [Filing No. 548-1 at 4.] Mr. Saar has a master's degree in civil engineering from the University of Florida and a Bachelor of Science Degree in civil engineering from the University of North Florida. [Filing No. 548-1 at 4.] He is a licensed Professional Engineer with the Florida Board of Professional Engineers. [Filing No. 548-1 at 4.] Mr. Saar has been employed in his current role at CSXT for nine years and before that he spent five years as a civil engineer for the United States Army Corps of Engineers. [Filing No. 548-1 at 4.]

Mr. Saar was tasked with providing his opinions regarding the following topics:

- CSXT's railroad operation;

- General railroading and engineering;

- Railroad safety and potential unsafe outcomes;

- The proper process and engineering of subgrade and aerial installations near a railroad;

- Whether Zayo's actions satisfied the relevant safety and engineering procedures and specifications;

- Potential risks caused by Zayo's actions; and

- Damage associated with Zayo's actions.

[Filing No. 548-1 at 6.]

In his Expert Disclosure, Mr. Saar sets forth a description of CSXT's interstate rail network; describes certain federal safety regulations and CSXT safety rules and regulations; discusses how land subsidence and other issues can cause train derailment and the risk of other damages; and summarizes CSXT's permitting, engineering, and safety requirements for the installation of utilities on, under, or over CSXT railroad property. [Filing No. 548-1 at 6-27.] Mr. Saar then sets forth a summary of CSXT's damages, using the following dictionary definitions of "damage": "to lessen the soundness, goodness, or value of; [to] impair[ ] [or reduce] the usefulness or value of…property." [Filing No. 548-1 at 27-28.] Mr. Saar opines that CSXT's "Rail Network Component" was reduced, impaired, or lessened "when the Zayo unauthorized installation comes within a certain distance." [Filing No. 548-1 at 28.] Mr. Saar sets forth the "CSXT Component Damage Distance" – the distance at which "Zayo's unauthorized installation of cable and/or conduit" begins to harm certain CSXT Components – for rails and roadbeds; switches; bridges; culverts; and railroad signal systems, train control systems, centralized dispatching systems, and highway railroad grade crossing warning signals. [Filing No. 548-1 at 28-30.] For example, Mr. Saar opines that for crossings, damage occurs "if the unauthorized fiber optic installation was less than appx. 15 feet deep; subject to [Theoretical Railroad Embankment Line ("TREL")] calculation (i.e., depending on depth and other variables)." [Filing No. 548-1 at 28.] For culverts, Mr. Saar opines that "[d]amage occurs if the unauthorized fiber optic installation was within a 100-foot radius of the culvert." [Filing No. 548-1 at 30.]

Finally, Mr. Saar opines that unauthorized and unsupervised installations "impose[ ] a significant risk of damaging CSXT's vital signal systems and technology infrastructure and causing interference with CSXT's current and future rail operations, reducing the value and usefulness of the property" and provides five site-specific examples. [Filing No. 548-1 at 31-49.]

C. Discussion

In support of its Motion to Exclude, Zayo argues that Mr. Saar's opinion regarding damages to CSXT "is unreliable conjecture that lacks factual foundation and any analytical rigor." [Filing No. 549 at 10.] It asserts that Mr. Saar does not base his opinions on sufficient facts or data, but rather on CSXT's internal guidelines and preferences, and that he does not "meaningfully engage" with information in Zayo's discovery responses, .kmz files[1], or construction and as-built drawings. [Filing No. 549 at 12.] Zayo contends that Mr. Saar does not identify support for his input variables, such as "depth of installation, height of existing ground, height of existing track, horizontal distance from track, etc." and only "assumes in hypothetical fashion both the figures and the calculation to conclude that every parallel installation is within the Railroad Influence

---

[1] The .kmz files – which are files that display geographical data, including custom overlay information, and are viewable in map applications like Google Earth – were produced by Zayo in response to an interrogatory propounded by CSXT which asked Zayo to: "Identify and Describe all Relevant Zayo Installations during each of the past five (5) years in the states of Indiana or Illinois." [Filing No. 39-1 at 9.] After producing the .kmz files, Zayo's Rule 30(b)(6) witness disavowed the fact that information from the .kmz files could be used to determine the location of Zayo's fiber optic cables, but Magistrate Judge Mark Dinsmore found that "Zayo will not be permitted to deny [the fact that the .kmz files show the locations of its installations] by generally asserting that the .kmz files are not accurate or cannot be relied upon to determine precise locations." [Filing No. 379 at 4.] However, Magistrate Judge Dinsmore noted that discovery was still open and that Zayo could supplement or amend its discovery response by the close of discovery "if it obtains new, specific evidence that the .kmz file is inaccurate as to a particular installation." [Filing No. 379 at 4-5.]

Zone."[2]  [Filing No. 549 at 13.] Zayo notes that material Mr. Saar attaches to his Expert Disclosure undermines his assumptions including, for example, documents that reflect a depth range from 5 to 7 feet at one site (despite assuming that all Zayo installations are at a depth of four feet). [Filing No. 549 at 13.] Zayo asserts that Mr. Saar notes that Zayo provided construction drawings for 160 sites but instead of analyzing the drawings, Mr. Saar simply states that he reserves the right to review the drawings (and the .kmz files) before providing site-specific testimony. [Filing No. 549 at 14.] Zayo also outlines what it argues are issues with the site examples that Mr. Saar provides. [Filing No. 549 at 14-16.]  It argues that Mr. Saar "points to no evidence that the metrics in the Table of Component Damage or elsewhere in the report are common industry standards implemented by other railroads, are required by federal regulations, or otherwise reflect industry norms." [Filing No. 549 at 17.] It asserts that "Mr. Saar's method…appears to be: (1) he reviewed internal CSXT policies and procedures to identify certain metrics, (2) he compiled a definition of 'damage', [and] (3) he asserted that failure to comply with metrics in (1) satisfied (2)," and that this approach "lacks factual and analytical rigor and method at each step and is unreliable as a result." [Filing No. 549 at 19.]  Finally, Zayo argues that Mr. Saar's opinions are unhelpful to the jury because he refers to potential outcomes but "does not state with specificity the likelihood of these harms, the specific scenarios in which they could arise, or any other features that would aid the jury in understanding the actual potential for catastrophe in this case." [Filing No. 549 at 19-20.]

  In its response, CSXT argues that Mr. Saar is a percipient fact witness because he was "personally involved in the ordinary-course-of-business CSXT investigation of Zayo's conduct in this case," and so his Expert Disclosure should be analyzed under Fed. R. Civ. P. 26(a)(2)(C).

---

[2] Mr. Saar defines the "Railroad Influence Zone" as "[t]he area between the TREL on either side of the track."  [Filing No. 548-1 at 16.]

[Filing No. 573-1 at 4-5.] As such, CSXT argues, Mr. Saar need only provide a summary of the facts and opinions to which he will testify and need not satisfy the more extensive requirements for an expert witness that does not have firsthand involvement in the events giving rise to the litigation under Rule 26(a)(2)(B). [Filing No. 573-1 at 5.] CSXT asserts that even if the Court analyzes Mr. Saar's expert opinions under Rule 26(a)(2)(B), his testimony should be allowed because Mr. Saar applies the correct definition of "damage" and Zayo's own expert agrees with that definition. [Filing No. 573-1 at 7-9.] CSXT contends that Zayo focuses on Mr. Saar's purported lack of facts, data, and examples of physical damage, but that Zayo "did not meaningfully engage on whether Mr. Saar considered sufficient facts and data regarding 'damage' as defined in his report." [Filing No. 573-1 at 9.] As to Mr. Saar's methodology, CSXT argues that he used data from the .kmz files and Zayo's interrogatory responses and that any perceived shortcoming in his methodology "is more properly addressed with vigorous cross examination." [Filing No. 573-1 at 10.] It argues that Mr. Saar described how a particular Zayo installation that is within the CSXT Component Damage Distance impairs the usefulness of each item of railroad equipment, and how the TREL is calculated and used to determine whether a Zayo installation has impaired the soundness of CSXT's railroad track and roadbed. [Filing No. 573-1 at 11-16.] CSXT notes that Zayo's expert witness admitted that CSXT's technical railroad specifications must be followed and are followed by industry participants, and that Mr. Saar cited to "an industry treatise written by a group of over 50 railroad professionals" in his Expert Disclosure. [Filing No. 573-1 at 16-18.] As for Zayo's argument that Mr. Saar only identifies speculative damages, CSXT argues that Mr. Saar opines regarding a present reduction and impairment in the usefulness or soundness of the railroad property or its equipment, not a future reduction and impairment. [Filing No. 573-1 at 19-21.]

Zayo argues in its reply that whether Mr. Saar is considered a percipient witness under Rule 26(a)(2)(C) or a reporting witness under Rule 26(a)(2)(B), his opinion still must satisfy Rule 702 and it does not. [Filing No. 566 at 2-3.] Zayo notes that it did not move to strike Mr. Saar's expert opinions based on the adequacy of Mr. Saar's disclosure, but rather on its argument that Mr. Saar does not have a reliable methodology that would be useful to the jury. [Filing No. 566 at 2-3.] Zayo asserts that CSXT does not respond to many arguments in its Motion to Strike and has, therefore, waived any opposition. [Filing No. 566 at 4-5.] It reiterates its argument that Mr. Saar only identifies potential problems, not actual ones, and argues that Mr. Saar has not provided any "evidence or citation for the notion that the type of bore-hole [that Zayo used in the installations] causes land subsidence," or any "evidence of any plans or uses CSXT has for the corridor that have been thwarted by any specific Zayo installation, or any fiber installation generally." [Filing No. 566 at 6.] Zayo argues that Mr. Saar developed his methodology, rather than using a methodology that is well-accepted in the engineering or railroad community. [Filing No. 566 at 7.] It identifies what it argues are shortcomings with Mr. Saar's calculation and use of the CSXT Component Damage Distance and TREL and asserts that Mr. Saar's conclusion that fiber that falls within those areas *de facto* damages CSXT is "unrecognized by the scientific community." [Filing No. 566 at 9.] Zayo notes that Mr. Saar states that multiple variables including the height of existing ground and the height of existing track are relevant in determining the potential impact of an installation within the Railroad Influence Zone, but that he "does not account for them despite that information being available had [he] undertaken an investigation of CSXT's own alleged property or equipment or reviewed materials he acknowledged he has." [Filing No. 566 at 9-10 (emphasis omitted).]

At the outset, the Court notes that the parties' dispute regarding whether Mr. Saar should be considered an expert witness under Fed. R. Civ. P. 26(a)(2)(B) or (a)(2)(C) affects only whether

he must provide a written report. The issue before the Court is whether Mr. Saar is qualified to testify as an expert and provide his proposed opinions under Rule 702, and the Court discusses that issue below.

The Court also acknowledges that the parties' dispute regarding the definition of "damage" in the context of this case informs the analysis of Mr. Saar's expert opinions. The Court discusses this issue in detail in its Order on Zayo's Motion for Partial Summary Judgment, also entered this day, but finds both here and in that Order that "damage" means to suffer some concrete and particularized harm, and not simply a risk of harm in the future. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016) (in order to have standing, a plaintiff must show that it "'suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'") (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). It is with this finding in mind that the Court analyzes Mr. Saar's opinions.

### 1. *Whether Mr. Saar Is Qualified*

Rule 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education." Zayo does not challenge Mr. Saar's qualifications, so the Court goes on to consider whether CSXT has sustained its burden of showing that it is more likely than not that Mr. Saar's methodology is scientifically reliable and that his testimony will aid the trier of fact.

### 2. *Whether Mr. Saar's Methodology Is Scientifically Reliable*

The United States Supreme Court in *Daubert* set forth four factors a court may consider when determining whether an expert witness's methodology is reliable, including: (1) whether the methodology "can be (and has been) tested"; (2) whether the methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the

methodology is generally accepted. *Daubert*, 509 U.S. at 593-94. These factors are not a "definitive checklist or test," *id.* at 593, and the weight of the factors is dependent on "the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The key focus "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Mr. Saar had before him Zayo's discovery responses, the .kmz files, and various construction drawings, and a reliable methodology would have consisted of using that information to determine whether Zayo's installations have caused a concrete and particularized harm to CSXT's equipment. But Mr. Saar does not use that information. Instead, for example, Mr. Saar makes assumptions regarding how far beneath the surface Zayo installed its fiber optic lines, [*see* Filing No. 548-1 at 18 ("I am to assume that Zayo's cable sits four feet…beneath the soil")], instead of using the information provided by Zayo, [*see, e.g.*, Filing No. 548-2 at 20 (Survey indicating that cable installations – including one by Zayo – ranged from 5 to 7 feet)], and making physical observations at the sites. He makes multiple assumptions, speculates and extrapolates, but provides no evidence to support his opinions. Simply put, he did not engage in the analysis required to produce evidence that Zayo's installations actually incurred on the Railroad Influence Zone, let alone caused any concrete and particularized damage. Indeed, he reserves the right to "review [documents produced by Zayo] before providing site-specific testimony." [Filing No. 548-1 at 19.]

Mr. Saar also heavily focuses on issues at a location at Montrose Street in Illinois – a location where the parties agree that CSXT's operations were interrupted and its equipment was damaged from Zayo's installations. But the damages that occurred at that location were allegedly

due to contractor negligence, and not due to the mere fact that Zayo made installations, which is the basis for Mr. Saar's opinions, most of CSXT's claims and the crux of this lawsuit. Mr. Saar discusses four other locations, but only opines that while no harm requiring repair or interrupting CSXT's operations has occurred yet, it could in the future. This opinion is not based on any methodology and is purely speculative.

Finally, Mr. Saar relies on CSXT's internal policies and procedures regarding installations without explaining whether they are consistent with industry standards or federal regulations. Simply citing to internal policies and procedures, asserting that Zayo did not comply, and opining that this non-compliance caused speculative damages is not a reliable methodology.

The Court finds that CSXT has failed to show that it is more likely than not that Mr. Saar's methodology for claiming potential damages as a result of the mere presence of Zayo's installations meets the reliability requirements of Rule 702.

### 3. Whether Mr. Saar's Testimony Will Aid the Trier of Fact

"Expert testimony is admissible only when it will assist the trier of fact, and fact-intensive findings are within lay competence and are the prerogative of the jury." *Aponte v. City of Chicago*, 2011 WL 1838773, at *3 (N.D. Ill. May 12, 2011); *see also Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (expert testimony is inadmissible if it does not aid the trier of fact, and the testimony must "fit the issue to which the expert is testifying [and be] tied to the facts of the case") (quotations and citations omitted).

Mr. Saar's opinions are speculative and not grounded in any investigation of Zayo's actions, other than at the Montrose Street location. Some of his speculative statements include:

- "Land subsidence incidents can occur because an outside party fails to perform an appropriate utility locate before installation commences or when utilities are mislocated." [Filing No. 548-1 at 19.]

- o But Mr. Saar does not state that Zayo actually failed to perform an appropriate utility locate or mislocated a utility, and that land subsidence actually occurred, or identify any specific sites where this happened.

- Railroad workers may not be within four feet of the field side of the near rail (the "fouling zone") except under certain circumstances. [Filing No. 548-1 at 12-13.]

    - o But Mr. Saar does not state that Zayo's contractors entered into the fouling zone or that, even if they did, CSXT property was somehow damaged as a result.

- "Unauthorized disturbance of the land within [the Railroad Influence Zone] may cause a catastrophe, including, but not limited to, a derailment." [Filing No. 548-1 at 16-17.] Mr. Saar then references an attached picture of a "land subsidence incident." [Filing No. 548-1 at 16-17.]

    - o But he does not identify it as a picture that has been produced in this lawsuit and he does not state that Zayo encroached in the Railroad Influence Zone with any of its installations or that, if it had, this encroachment caused concrete and particularized damages.

- "[L]and subsidence can be caused by a 'frac out,' which can occur when the bentonite slurry (i.e. drill fluid) is forced up to the ground surface and flows freely onto and around the tracks. This, in turn disturbs the roadbed and fouls the ballasts thereby filling the voids within the ballast… It is critical to monitor various pressures when boring…, so as to minimize the possibility of a frac-out as well as monitor for any direct frac-outs beneath the track resulting in the fouling of the ballast. Drilling at a depth less than what CSXT enforces can also lead to the outside party hitting a boulder or other foreign object as it bores the hole, causing the drill to veer off course. This can cause severe damage to CSXT Railroad Property and Components." [Filing No. 548-1 at 19-20.]

    - o But Mr. Saar never states that Zayo's contractors improperly drilled or that, if they did, the improper drilling caused concrete and particularized damage to CSXT's property.

- Lists various circumstances where he opines damage would occur – *e.g.*, when the fiber optic installation was less than approximately 15 feet deep at a crossing, or when the fiber optic installation was within 1,000 feet of a bridge or within 50 feet of the top of a rail. [Filing No. 548-1 at 28-30.]

    - o But Mr. Saar never states that Zayo committed these acts or that, if it did, any concrete and particularized damage has occurred.

- "An issue could arise" as to a culvert at a site on Jackson Street where Zayo installed fiber optic cable that "directly traverses CSXT's culvert" and "the integrity of the culvert is in question." [Filing No. 548-1 at 38-39.]

    o But Mr. Saar does not state that any concrete and particularized damage has actually occurred.

- "The Zayo handholds were installed within close proximity to the rails [at the Jackson Street site], rendering CSXT unable to stockpile rail ties or other materials when performing maintenance." [Filing No. 548-1 at 41.]

    o But Mr. Saar does not state that CSXT tried to stockpile rail ties and that it suffered some damage because it could not do so.

- Speculations regarding consequences which could occur at three other sites – a site in Carlisle, Indiana; a site in Whiting, Indiana; and a site in Indianapolis, Indiana. [*See, e.g.*, Filing No. 548-1 at 44 ("Any defect or physical damage to the systems caused by Zayo may lie dormant for years, yet could cause an accident at any moment.").]

    o But Mr. Saar does not provide examples of any consequences that have actually occurred because of Zayo's actions.

Mr. Saar's references to what "could" or "may" happen, what caused "a significant risk of damage," or what "could have impacts," are not helpful and may confuse the jury, along with his reference to news stories involving railroad catastrophes that have nothing to do with this case and to photographs of dangerous conditions near railroad tracks that do not apply to the locations in this case. The Court finds that CSXT has not shown that it is more likely than not that Mr. Saar's testimony will aid the trier of fact.

In sum, the Court finds in exercising its gatekeeping function that CSXT has not sustained its burden of showing by a preponderance of the evidence that Mr. Saar's methodology is reliable and that his opinions would aid the trier of fact. Consequently, the Court **GRANTS** Zayo's Motion to Exclude Expert Opinions of Alex R. Saar. [Filing No. 548.] Mr. Saar may not provide expert opinion testimony in this case, but he may provide lay testimony as an employee of CSXT as long as it is not based on conjecture or speculation. The Court notes specifically that Mr. Saar may

testify regarding damage he observed at the Montrose Street site, but considers this testimony to be lay testimony based on his status as a CSXT employee, and not based on his status as an expert witness.

## III.
### CONCLUSION

For the foregoing reasons, the Court:

- **DENIES** Zayo's Motion to Strike Plaintiff's Opposition to Zayo's Motion to Exclude Alex Saar, P.E.'s Expert Testimony, [565];

- **GRANTS** CSXT's Motion to Substitute Brief, [573]; and

- **GRANTS** Zayo's Motion to Exclude Expert Opinions of Alex R. Saar, [548].

Date: 4/23/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**