UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02859-JRS-MJD |
| | ) | |
| ZAYO GROUP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Undersigned on Defendant's Partial Motion to Dismiss Count VI and Count IV under Rule 12(b)(1). [Dkt. 637.] The Court designated the Undersigned to issue a report and recommendation regarding the disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 644.] For the reasons set forth below, the Undersigned recommends that Defendant's motion be **GRANTED** in its entirety.

## I. Introduction

Plaintiff operates railroad lines across Indiana and Illinois.[1] In a nutshell, Plaintiff alleges in this case that Defendant committed several torts when it installed underground and aerial fiber optic cable (hereinafter referred to simply as "cable") on (or over) property in which Plaintiff has a property interest. In its Third Amended Complaint, [Dkt. 210], Plaintiff identified over four hundred sites that were at issue; many of those sites have since been eliminated from the case.

---

[1] Plaintiff's claims related to sites in Illinois have been dismissed for lack of personal jurisdiction. *See* [Dkt. 741].

Defendant raises two distinct issues in the instant motion.  First, Defendant seeks dismissal of Plaintiff's claim for civil trespass to components (Count VI) for lack of subject matter jurisdiction as to all of the sites remaining at issue.[2]  Defendant also seeks dismissal—again, for lack of subject matter jurisdiction—of Plaintiff's claim for criminal theft or conversion (Count IV) for sites at which Plaintiff's property interest is an easement.  Each of these issues are addressed, in turn, below.

## II.  Civil Trespass to Components (Count VI)

In Count VI of its Third Amended Complaint, Plaintiff asserts that Defendant committed the tort of trespass to chattel[3] because Defendant's installation of cable interfered with Plaintiff's railroad components, which include "rails, switches, roadbeds, viaducts, bridges, trestles, culverts, embankments, railroad signal systems, train control systems, centralized dispatching systems, highway railroad grade crossing warning signals, locomotives, railroad cars, trains, and/or equipment" (hereinafter referred to as the "Components").  [Dkt. 210 at 31 n.5.]  In the instant motion, Defendant argues that Plaintiff lacks standing to assert this claim because Plaintiff cannot satisfy the constitutional injury-in-fact requirement.

### A.  Injury-in-Fact Requirement

A federal court lacks subject matter jurisdiction over a claim if the plaintiff lacks standing to assert it.  Judge Magnus-Stinson addressed the injury-in-fact requirement for standing at length in her ruling on Defendant's motion for partial summary judgment:

> The Court has an obligation to determine whether a party has standing to sue under Article III of the United States Constitution and can raise the issue *sua*

---

[2] Defendant did not seek dismissal of the trespass to components claim as to the site the parties commonly refer to as the "Montrose Site"; however, the claim as to that site has since been dismissed because it is located in Illinois.

[3] Plaintiff calls its claim civil trespass to components, but the tort alleged is traditionally referred to as trespass to chattel.

*sponte* if the parties do not.  Indeed, standing is a threshold issue, and the Court must discuss it at the outset.  *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).  "Because standing is an essential ingredient of subject-matter jurisdiction, it must be secured at each stage of the litigation." *Id.* Although at the pleading stage "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), "[o]nce the allegations supporting standing are questioned as a factual matter—either by a party or by the court—the plaintiff must support each controverted element of standing with 'competent proof,'" *Bazile*, 983 F.3d at 278 (quoting *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).  "Competent proof" means "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).

To have standing to sue in federal court under Article III, a plaintiff must establish that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Injury in fact is "the '[f]irst and foremost' of standing's three elements," and the plaintiff must show that it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 338-39 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998); *Lujan*, 504 U.S. at 560) (internal quotations omitted)). "Without an injury that the defendant caused and the court can remedy, there is no case or controversy under Article III." *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (7th Cir. 2023).

[Dkt. 607 at 13-14.]

**B.  Plaintiff's Trespass to Chattel Claim**

To prove trespass to chattel under Indiana law—which indisputably applies to this claim, *see* [Dkt. 607 at 15]—Plaintiff must show:  (1) Defendant dispossessed Plaintiff of its chattel; (2) Defendant impaired the chattel's condition, quality, or value; (3) Defendant deprived Plaintiff of the use of its chattel for a substantial time; or (4) Defendant harmed some other thing in which Plaintiff had a legally protected interest.  *Coleman v. Vukovich*, 825 N.E.2d 397, 407 (Ind. Ct. App. 2005) (citing *Terrell v. Rowsey,* 647 N.E.2d 662, 666 (Ind. Ct. App. 1995)).  In Count VI of its Third Amended Complaint, Plaintiff alleges that Defendant did the following:

- "disturbed and damaged" Plaintiff's Components;

- "invaded the exclusive possession and physical condition" of the Components;

- dispossessed Plaintiff of the Components;

- "impaired and diminished [the Components'] condition, quality, and value";

- deprived Plaintiff of the use of the Components for a substantial time;

- "harmed" the Components;

- "unlawfully exercised authority over" the Components;

- "cut, carved, lacerated, incised, and otherwise altered" the Components without [Plaintiff's] authorization;

- "injured and interfered" with Plaintiff's possession of the Components;

- "used and intermeddled" with the Components;

- took the Components without Plaintiff's consent;

- obtained the Components by duress;

- barred Plaintiff's access to the Components;

- destroyed the Components while they were in Defendant's possession; and

- "intruded upon and invaded" the Components.

[Dkt. 210 at 46-67.] Notwithstanding these conclusory allegations, Defendant argues that Plaintiff has no competent proof that the actions taken by Defendant caused any injury-in-fact to Plaintiff vis-à-vis the Components.

### C. Plaintiff's Argument That It Has Suffered an Injury-in-Fact

Reading the allegations set forth above, one would think that Defendant absconded with some of Plaintiff's Components, caused physical damage to others, and kept Plaintiff from using still others for some period of time. Reality, however, is quite different. In fact, Plaintiff does not point to evidence that any of those things actually happened at any of the sites at issue.

Instead, Plaintiff asserts that the mere fact of Defendant's unauthorized installation of its cable in the vicinity of the Components "interfered with [Plaintiff's] property rights in its Railroad Components." [Dkt. 655 at 14.]  But that type of general interference with property rights in chattel is simply not sufficient to give a plaintiff standing to assert a claim for trespass to chattel. Rather, as Plaintiff recognizes in its brief, standing "often turns on the nature and source of the claim asserted," *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and therefore "[t]he sufficiency of an injury-in-fact depends on the claim," [Dkt. 655 at 7.]  In this case, the source of the claim asserted is the common law tort of trespass to chattel.  As noted above, that tort requires that the action taken by Defendant caused one of four things:  (1) the dispossession of Plaintiff of the chattel; (2) the impairment of the chattel's condition, quality, or value; (3) the deprivation of Plaintiff's ability to use of the chattel for a substantial time; or (4) harm to some other thing in which Plaintiff had a legally protected interest.  In order to demonstrate that the requisite injury-in-fact exists for this claim, Plaintiff must point to "competent proof" that at least one of these things occurred because of Defendant's actions.  As explained in detail below, Plaintiff's arguments that it has done so fall short.

*1. Dispossession*

One way in which the tort of trespass to chattel can occur is if the defendant dispossesses the plaintiff of the chattel.  To "dispossess" means "to take property or land away from."  Black's Law Dictionary (12th ed. 2024).  As explained in the Restatement of Torts,

> A dispossession may consist of an assumption of complete control and dominion over the chattel without an actual taking or carrying away.  If the assumption of control effectively deprives the other of all the essential advantages of possession, the dispossession is complete, although the physical position of the chattel may remain unchanged.

Restatement (Second) of Torts § 221 (1965).  In addition,

> A dispossession may take place by intentionally preventing the possessor from having access to a chattel.  Thus where the actor by duress and intimidation forcibly prevents another from entering a warehouse for the purpose of removing his goods stored there, the other has been dispossessed of the goods. . . .  On the other hand, merely depriving the possessor of a chattel of a particular use of it is not a dispossession of the other.

*Id.*

Plaintiff asserts that the installations of the cable "sufficiently interfere with [Plaintiff's] access to and physical control over the Railroad Components (particularly underground equipment) to functionally dispossess [Plaintiff] of them." [Dkt. 655 at 17.]  But Plaintiff does not explain how.  Plaintiff does not allege that it is currently unable to access, use, or control any Component because of Defendant's cable installation.[4]  Plaintiff's railroad is still operating, and Plaintiff has submitted no evidence that any of the Components are no longer fulfilling their intended purpose because of Defendant's actions.  Accordingly, Plaintiff has not been deprived of "all the essential advantages of possession" of the Components, and no dispossession has occurred.

### 2.  Deprivation of Right of Exclusion

Plaintiff also argue that Defendant's cable installations "violate [Plaintiff's] right to exclude others from the Railroad Components, which itself is a cognizable injury." [Dkt. 655 at 15] (citing *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) ("One of the main rights attaching to property is the right to exclude others . . . ."); *Ass'n of Am. R.R.s v. Hudson*, 2024 WL 1626105, at *19 (E.D. Va. Apr. 15, 2024) (holding that "railroads' alleged loss of the right to exclude [] qualifies as a sufficient injury in fact that would provide them with standing")).  This argument ignores the difference between the rights that attach to the ownership of real property and those that attach to the ownership of chattel.

---

[4] Plaintiff's argument that this might happen in the future is addressed below.

Where a trespass to land has occurred, nominal damages are available to the landowner simply because the trespass occurred.  This is because

> [i]n a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded.  Thus, when one man placed his foot on another's property, the property owner needed to show nothing more to establish a traditional case or controversy. *See Entick v. Carrington,* 2 Wils. K.B. 275, 291, 95 Eng. Rep. 807, 817 (1765). Many traditional remedies for private-rights causes of action—such as for trespass, infringement of intellectual property, and unjust enrichment—are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right.  *See* Brief for Restitution and Remedies Scholars as *Amici Curiae* 6-18; see also *Webb v. Portland Mfg. Co.,* 29 F.Cas. 506, 508 (No. 17,322) (Me.1838) (stating that a legal injury "imports damage in the nature of it" (internal quotation marks omitted)).

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 344-45 (2016), *as revised* (May 24, 2016) (Justice Thomas, concurring).  Not so when a trespass to chattel is alleged.  As the Restatement of Torts explains:

> [t]he interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel.  In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor.  Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c).  Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference.

Restatement (Second) of Torts § 218 (1965).[5]  The cases cited by Plaintiff involve real property.

But just as "[t]respass to chattels is a different claim than railroad mischief," [Dkt. 655 at 15], so

---

[5] The exception to this is a trespass to chattel that results in a dispossession.  Per the Restatement,

> [w]here the trespass to the chattel is a dispossession, the action will lie although there has been no impairment of the condition, quality, or value of the chattel, and no other harm to any interest of the possessor.  He may recover at least nominal

too is trespass to chattel a different claim than trespass to land.  Plaintiff cites to no authority to support its argument that the injury requirement for the tort of trespass to chattel, as opposed to trespass to land, can be satisfied by the violation of the right to exclude others from the chattel.[6]

Indiana authority is consistent with the Restatement on this issue.  In *Terrell v. Rowsey, 647 N.E.2d 662 (Ind. Ct. App. 1995),* the plaintiff asserted a claim for trespass to chattel based on a confrontation between the plaintiff and his supervisor in the company parking lot in which the supervisor accused the plaintiff of drinking alcohol in his car during a break.  During the confrontation, the supervisor "opened the car door approximately six inches and reached behind the driver's seat to grab [a] bottle" that he could see through the car window.  *Id.* at 664.  In rejecting the plaintiff's trespass to chattel claim based on this action, the Indiana Court of Appeals reasoned as follows:

> Concerning Terrell's second allegation of trespass upon his car, no case has been decided in Indiana regarding the claim of trespass to an automobile.  The *Restatement (Second) of Torts* (1965), § 218 states a trespasser is liable to the possessor of a chattel only when:
>
>> (a) he dispossesses the other of the chattel, or
>> (b) the chattel is impaired as to its condition, quality, or value, or
>> (c) the possessor is deprived of the use of the chattel for a substantial time, or
>> (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor had a legally protected interest.
>
> The facts are clear that [the supervisor] did not dispossess [the plaintiff] of his automobile and it sustained no impairment as to its condition, quality or value when [the supervisor] opened the door.  Furthermore, [the plaintiff] suffered no bodily harm due to [the supervisor's] actions, and no harm came to any person or

---

damages for the loss of possession, even though it is of brief duration and he is not deprived of the use of the chattel for any substantial length of time.

Restatement (Second) of Torts § 218 (1965).  As set forth above, no dispossession occurred in this case.

[6] The reference to the "right to the exclusive possession of a chattel" in *Duke Energy of Indiana, LLC v. City of Franklin,* 69 N.E.3d 471, 483 (Ind. Ct. App. 2016), is not inconsistent with the Restatement, which, as quoted above, specifically recognizes a "possessor's interest in the mere inviolability of his chattel."  Restatement (Second) of Torts § 218 (1965).

thing in which [the plaintiff] held a legally protected interest.  Although [the plaintiff] might have been deprived of the use of his car when [the supervisor] opened the door, it was not for a substantial time, inasmuch as [the plaintiff] testified the entire episode lasted from three to five minutes and [the supervisor] made no attempt to utilize his automobile. [The defendants] prevail on the trespassing to an automobile claim as a matter of law.

*Id.* at 666-67.  In other words, the mere invasion of the plaintiff's property rights in his automobile did not constitute a trespass to chattel in the absence of an injury caused by that invasion.

Plaintiff's allegation that the cable installations violated its right to exclusive possession of the Components is not a basis for finding that Plaintiff has standing to assert a claim for trespass to chattel.

### 3.  *Plaintiff's Remaining Arguments*

The crux of Plaintiff's injury argument, and the focus of the testimony it proffered at the hearing, is Plaintiff's allegation that "[t]he presence of unauthorized [cable] installations without precise locations interferes with [Plaintiff's] access, repair, or relocation of its Railroad Components, thus invading [Plaintiff's] property rights," [Dkt. 655 at 17], and that "'[u]nknown and unmarked fiber cables inhibit [Plaintiff] from safely operating its railroad and Components and performing critical maintenance and inspections unencumbered,'" *id.* (quoting Plaintiff's own interrogatory response).  The indiscriminate breadth of these assertions proves their fallaciousness.  It is certainly possible to imagine a scenario in which a particular cable installation might interfere with the ability to repair, relocate, or access a particular Component.  But simply stating that to be the case as to each and every Component on each and every site at issue falls far short of Plaintiff's burden, which is, as noted above, to provide competent proof to back up its conclusory allegations.  This would require evidence specific to each site that demonstrated that the particular cable installation has actually interfered with Plaintiff's ability to

access, repair, inspect, relocate, use, or control a particular Component. With a few exceptions, discussed below, Plaintiff has not even attempted to offer such proof. Plaintiff cannot establish standing for its trespass to chattel claim by asserting that the mere existence of the cables in the vicinity of its Components constitutes injury to the Components.

In its brief, Plaintiff provides three examples that it asserts show that the cable installations have caused injury. First, they point to a site in Whiting, Indiana, and provide the following photograph, which "indicate[s] that [Defendant] installed fiber-optic cables directly on or adjacent to railroad switches" on the site:



**FIGURE 1.**

*Id.* at 18. Plaintiff then argues that "[u]nauthorized Zayo installations like this one **may** interfere with [Plaintiff's] ability to access and exercise physical control over the Railroad Components, such as to upgrade, maintain, or relocate the Components, especially given the uncertainties as to the installations' precise location relative to the [Plaintiff's] Railroad Components." *Id.* at 18-19

(emphasis added) (citing Ex. 9, Decl. of A. Saar ¶¶ 7-14; Resp. to Interrog. 13). Second, Plaintiff notes that its "corporate representative [Mr. Saar] testified regarding the placement of an unauthorized Zayo cable installation beneath a CSXT signal hut (which houses critical infrastructure)." *Id.* at 19. Citing to Mr. Saar's testimony, Plaintiff argues that "[b]ecause of [Defendant's] unauthorized installation, [Plaintiff's] ability to relocate that signal hut is impaired. In other words, [Defendant's] installation made [Plaintiff] 'unable to access [its] railroad facilities and conduct railroad operations the way [it] need[s] to' such that the installation had 'become an impediment.'" *Id.* Third, also citing to Mr. Saar's testimony, Plaintiff references another site on which a cable installation "run[s] directly over, under, or through [] a railroad culvert [owned by Plaintiff] (which provides drainage to ensure the stability and structural integrity of the track roadbed)." *Id.* Plaintiff argues that the installation "effectively dispossesses [Plaintiff] of its property by 'impair[ing] [Plaintiff's] ability to be able to replace that culvert when the time comes' given that 'now [Defendant's] facility is in the way.'" *Id.* (citation omitted).[7]

The are several obvious problems with Plaintiff's argument. First, the fact that something **may** occur in the future is not sufficient to establish standing.

> [T]o confer Article III standing, a plaintiff's injury must not only be "concrete and particularized" but also "actual or imminent." *Lujan* [*v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)]. The latter requirement for standing "ensure[s] that the alleged injury is not too speculative for Article III purposes." *Id.* at 564 n.2 . . . . Thus, when a claimant premises standing on a future harm, the harm must be more than just "possible"—the allegedly threatened injury must be "certainly impending." *Whitmore* [*v. Arkansas*], 495 U.S. [149, 158 (1990)].

---

[7] In a footnote, Plaintiff also sites generally to certain portions of Mr. Saar's expert report and his deposition testimony based on that report that discuss particular sites. *See id.* at 20 n.14 (citing [Dkt. 465, at 37-41] ([Defendant's] impairment at Jackson Street), 42-44 ([Defendant's] impairment at Site 430), *id.* at 44-47 ([Defendant's] impairment at Site 354/355), *id.* at 47-48 ([Defendant's] impairment at Site 48); Dkt. 470-13 at 244:22-245:23 (p.4), *id.* at 246:14-249:3 (p.5), *id.* at 250:24-253:23 (p.6), *id.* at 255:2-256:3 (p.7), *id.* at 259:20-25 (p.8), *id.* at 260:5-7 (p.8), *id.* at 260:13-19 (p.8), *id.* at 261:24-262:6 (p.8), *id.* at 269:21-270:4 (p.10), *id.* at 272:18-273:6 (p.11), *id.* at 274:15-276:2 (p.12)).

*Bost v. Illinois State Bd. of Elections*, 114 F.4th 634, 642 (7th Cir. 2024).

Second, let's assume that Plaintiff had competent proof that a particular cable running near, for example, a signal box, had inhibited Plaintiff's ability to replace or repair that signal box. The extra cost of making the repair or replacement might be an element of the damages caused by the cable trespassing on Plaintiff's land, but those additional costs do not constitute a trespass on the signal box itself.

This leads to the most fundamental problem with Plaintiff's argument, which is that it is dependent on the opinions of Mr. Saar that already have been rejected in this case. Indeed, Judge Magnus-Stinson addressed the deficiencies in Mr. Saar's opinions in both her ruling on Defendant's Motion to Exclude Expert Opinion of Alex R. Saar, [Dkt. 606], and her ruling on Defendant's summary judgment motion, [Dkt. 607]. In the former, Judge Magnus-Stinson stated the following:

> Mr. Saar had before him [Defendant's] discovery responses, the .kmz files, and various construction drawings, and a reliable methodology would have consisted of using that information to determine whether [Defendant's] installations have caused a concrete and particularized harm to [Plaintiff's] equipment. But Mr. Saar does not use that information. Instead, for example, Mr. Saar makes assumptions regarding how far beneath the surface [Defendant] installed its fiber optic lines, [*see* Filing No. 548-1 at 18 ("I am to assume that [Defendant's] cable sits four feet…beneath the soil")], instead of using the information provided by [Defendant], [*see, e.g.*, Filing No. 548-2 at 20 (Survey indicating that cable installations – including one by [Defendant]– ranged from 5 to 7 feet)], and making physical observations at the sites. He makes multiple assumptions, speculates and extrapolates, but provides no evidence to support his opinions. Simply put, he did not engage in the analysis required to produce evidence that [Defendant's] installations actually incurred on the Railroad Influence Zone, let alone caused any concrete and particularized damage. Indeed, he reserves the right to "review [documents produced by Defendant] before providing site-specific testimony." [Filing No. 548-1 at 19.]
>
> Mr. Saar also heavily focuses on issues at a location at Montrose Street in Illinois –a location where the parties agree that CSXT's operations were interrupted and its equipment was damaged from [Defendant's] installations. But the damages

that occurred at that location were allegedly due to contractor negligence, and not due to the mere fact that [Defendant] made installations, which is the basis for Mr. Saar's opinions, most of [Plaintiff's] claims and the crux of this lawsuit. Mr. Saar discusses four other locations, but only opines that while no harm requiring repair or interrupting [Plaintiff's] operations has occurred yet, it could in the future. This opinion is not based on any methodology and is purely speculative.

Finally, Mr. Saar relies on [Plaintiff's] internal policies and procedures regarding installations without explaining whether they are consistent with industry standards or federal regulations. Simply citing to internal policies and procedures, asserting that [Defendant] did not comply, and opining that this non-compliance caused speculative damages is not a reliable methodology.
The Court finds that [Plaintiff] has failed to show that it is more likely than not that Mr. Saar's methodology for claiming potential damages as a result of the mere presence of [Defendant's] installations meets the reliability requirements of Rule 702.

[Dkt. 606 at 12-13.] Judge Magnus-Stinson also concluded that Plaintiff "has not shown that it is more likely than not that Mr. Saar's testimony will aid the trier of fact" because of the speculative nature of his testimony. [Dkt. 606 at 15.] Judge Magnus-Stinson noted numerous examples of the "speculative statements" in Mr. Saar's report and concluded that his "references to what 'could' or 'may' happen, what caused 'a significant risk of damage,' or what 'could have impacts,' are not helpful and may confuse the jury, along with his reference to news stories involving railroad catastrophes that have nothing to do with this case and to photographs of dangerous conditions near railroad tracks that do not apply to the locations in this case." *Id.* Judge Stinson therefore excluded Mr. Saar's opinions from this case.

Consistent with this ruling, Judge Magnus-Stinson noted the following in her ruling on Defendant's motion for summary judgment:

Finally, the Court has granted [Defendant's] Motion to Exclude the testimony of [Plaintiff's] expert, Alex Saar, in part because Mr. Saar's opinions as to [Plaintiff's] damages are speculative. This is the only evidence upon which [Plaintiff] relies to show that is has been damaged at locations other than Montrose Street. While the Court has excluded Mr. Saar's testimony, it addresses that evidence to show how [Plaintiff's] definition of damages directly conflicts with the requirement that [Plaintiff] have suffered some type of concrete and

particularized damage to have standing to bring many of its claims.  For example, Mr. Saar opines that [Plaintiff] was damaged at the Jackson Street Location because "[a]n issue could arise" as to Zayo's installation that "directly traverses [Plaintiff's] culvert" and that "the integrity of the culvert is in question." [Filing No. 548-1 at 38-39.]  But Mr. Saar does not state that any tangible, concrete damage has occurred to date.  He also opines that Zayo installed handholes too close to the rails at the Jackson Street Location, making it impossible for [Plaintiff] to stockpile rail ties or other materials when performing maintenance, but does not state that [Plaintiff] has tried to stockpile rail ties or even has any plans to stockpile rail ties.  [Filing No. 548-1 at 40-41.]  In short, [Plaintiff's] definition of damage and its failure to show that any concrete physical damage has occurred at any sites in Indiana flies in the face of the requirement that a party must have "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, 578 U.S. at 338-39* (quotations and citation omitted).

[Dkt. 607 at 31-32] (footnote omitted).

It is perplexing that, in response to the instant motion, which was filed after the rulings

discussed above, Plaintiff cites to opinions that have been excluded from this case.  The closest

Plaintiff comes to acknowledging that Saar's expert opinions have been excluded from this case

is the following statement in its brief:

> Judge Magnus-Stinson made various rulings concerning the expert testimony of Mr. Alex Saar, P.E., who is [Plaintiff's] Director of Corridor Services.  In the summary judgment order, Judge Magnus-Stinson "did not find . . . that [Plaintiff] lacks standing to assert its trespass to chattels/components claims."  Order Denying Mot. to Modify Court's Summ. J. Order, Doc. 632 at 13 n.3.  The Court should thus consider the prior evidence submitted by [Plaintiff] anew under the trespass-to-chattels standard.

[Dkt. 655 at 16.]  That argument is either disingenuous or delusional.  The evidence in question

was **excluded in its entirety** by Judge Magnus-Stinson's ruling on Defendant's Motion to

Exclude Expert Opinion of Alex R. Saar, [Dkt. 606].[8]  It is true that Judge Magnus-Stinson did

---

[8] While Plaintiff argues that other rulings by Judge Magnus-Stinson should be "revisited," *see* [Dkt. 655 at 4], Plaintiff does not argue that Judge Magnus-Stinson's ruling excluding Mr. Saar's expert opinions should be reconsidered.  Nor would any such argument have been successful, given the soundness of that ruling.

not apply that ruling on the trespass to chattel claim in her summary judgment order, because that claim was not before her, but that does not change that fact that Plaintiff has been barred from relying on Saar's expert opinions in this case for any purpose.[9]

All of the evidence from Mr. Saar that Plaintiff cites to in its brief is dependent on the expert opinions that were excluded by Judge Magnus-Stinson's ruling.[10]  Plaintiff also included the following statement in its brief:

> At the evidentiary hearing on this motion, [Plaintiff] reserves the right to call Mr. Saar to testify as a fact witness,[11] including in accordance with his verified Response to Interrogatory 13 based upon [Defendant's] .kmz mapping files.

---

[9] While Plaintiff correctly quotes Judge Magnus-Stinson as stating that she "did not find . . . that [Plaintiff] lacks standing to assert its trespass to chattels/components claims," [Dkt. 655 at 16], Plaintiff conveniently ignores what immediately follows the quoted language in Judge Magnus-Stinson's order:

> Given that [Defendant] did not raise the trespass to components issue, the Court has no idea if [Plaintiff] has provided [Defendant] with evidence of damages to its components (**separate and apart from the type of speculative damages espoused by Mr. Saar and already rejected by the Court**).  If not, [Plaintiff's] standing to pursue its trespass to chattels claim may remain at issue. *Sadat v. Mertes*, 615 F.2d 1176, 1188 (7th Cir. 1980) (issue of court's subject-matter jurisdiction can be raised "at any time and at any stage of the proceedings"). But if so, the jury will determine whether the claim has merit.

[Dkt. 632 at 13 n.3] (emphasis added).  Plaintiff's briefing in this instance comes dangerously close to violating the requirements of Federal Rule of Civil Procedure 11(b).

[10] The fact that Plaintiff presents those expert opinions in a new declaration from Mr. Saar that is submitted in his capacity of Plaintiff's Director of Corridor Services, [Dkt. 655-8 at 1], and cites to Mr. Saar's Rule 30(b)(6) testimony, rather than citing to his expert report, does not change that fact, or the analysis underlying Judge Magnus-Stinson's decision.

[11] Plaintiff's footnote reads:  "Judge Magnus-Stinson specifically authorized this. *See* Doc. 606 at 15-16 ('[Mr. Saar] may provide lay testimony as an employee of [Plaintiff] as long as it is not based on conjecture or speculation.  The Court notes specifically that Mr. Saar may testify regarding damage he observed at the Montrose Street site, but considers this testimony to be lay testimony based on his status as [an] employee of [Plaintiff] . . . .')."

*Id.* (footnote renumbered).[12]  If Plaintiff had any evidence of injury related to its trespass to

chattel claim that did not depend on Mr. Saar's excluded expert opinion, it should have identified

that evidence in its response brief.  Nonetheless, the Court gave Plaintiff the opportunity to

present Mr. Saar's testimony at the hearing on the instant motion in order to make a record.

Thus, Defendant's motion to strike, [Dkt. 717], is **DENIED** to the extent that this testimony and

other evidence has been allowed for purposes of this hearing.  However, it has not all been

admitted by the Undersigned.  *See* Hearing Transcript, January 17, 2025, at p. 57-58 (noting that

Mr Saar's testimony was allowed for the purposes of "mak[ing] a record as a proffer").

Even if Mr. Saar's hearing testimony had been admitted as evidence, it would not have

helped Plaintiff, because that testimony suffers from the same deficiencies as Plaintiff's other

evidence on this issue.  Mr. Saar testified at length about Plaintiff's permitting process and how

the various requirements of that process help ensure the safety of any installation on Plaintiff's

property and give Plaintiff information about the location and nature of those installations.  *See*

*generally* Hearing Transcript, January 17, 2025, at p. 25 *et seq.*  Mr. Saar further testified that

because Defendant did not obtain permits for its installations, Defendant's unauthorized

installations could complicate future actions (maintenance, repairs, upgrades, etc.) that Plaintiff

might need to take on the sites where the installations are located.  *See generally id.* at 46 *et seq.*

But Mr. Saar conceded on cross-examination that none of those complications have actually

come to pass at any site.  *See id.* at 161 *et seq.*  Indeed, Mr. Saar conceded that he was not aware

---

[12] To be clear, the Response to Interrogatory 13 was **Plaintiff's** response, not Mr. Saar's response, and Mr. Saar's verification expressly states that the verification is made "in [his] representative capacity as CSXT Senior Manager of Corridor Services only, and not personally," and "that the factual matters stated for Plaintiff in the above Responses to Interrogatories are either based on [his] personal knowledge or information supplied or assembled at the direction of Plaintiff." [Dkt. 655-7 at 18.]

of any plans that Plaintiff had to take any of the actions about which he testified at any of the sites in the near future. *Id.* He further testified that Plaintiff has not taken any actions to mitigate or prevent the possible future harm he identified. *Id.* at 190. Indeed, Mr. Saar's testimony supports a finding that he does not know whether **any** of Defendant's installations actually pose a future risk, or whether Defendant in fact complied with all of the requirements that would have been necessary to obtain a permit even though no permit was obtained. *Id.* at 192.

Some of Mr. Saar's testimony related to how problematic it is if no permit is obtained because when something needs to be done with a cable line—for example, after a storm, various lines that have been installed on Plaintiff's property might need to be repaired or replaced—Plaintiff would not know who to call to make that happen. *Id.* at 33-34. However, as to each of the sites at issue in this case, Plaintiff now knows that Defendant has installed cable at that site, so Plaintiff would know to call Defendant. More importantly, Plaintiff does not explain why it would have any obligation to Defendant to protect or facilitate the repair of Defendant's unauthorized installations. Plaintiff's licensing agreement with certain telecommunications companies or utilities require Plaintiff to give notice to the licensee in certain circumstances, *see generally* [Dkt. 656-2 through -11], but if Defendant's fiber installation is trespassing on Plaintiff's land, it is unclear where the legal obligation for Plaintiff to take measures to protect Defendant's line would come from.

Even more fundamentally, none of the possible future inconveniences or damage Mr. Saar points to actually constitutes a trespass to chattel. They might constitute an element of damages for Defendant's trespass on Plaintiff's **land**—assuming they are not too speculative—but they simply do not constitute dispossession of any chattel, impairment of any chattel's condition, quality, or value, deprivation of the use of any chattel for a substantial time, or harm to

some other thing in which Plaintiff had a legally protected interest because something was done to one of Plaintiff's **components**.

There is no doubt that Mr. Saar relies on Plaintiff's permitting process for the orderly performance of his job responsibilities and that Plaintiff has good reasons for preferring that its permitting processes are followed. The fact that they were not followed by Defendant might well cause Plaintiff to have to take steps in the future that it might not have to take if the permit process had been followed. This potential for extra burden on Plaintiff in the future is the core of Plaintiff's injury argument. But Mr. Saar's testimony that, based on his experience, he predicts that such things will happen in the future is paradigmatic expert testimony—expert testimony that has already been excluded from this case. And even if it were to be considered, Mr. Saar could only testify that there is a **potential** for some various types of problems at some **unknown** future time. This, as Judge Magnus-Stinson has already explained, is simply not sufficient for standing.

Plaintiff has not presented competent proof that it has suffered an injury-in-fact from any trespass to its Components. Accordingly, Plaintiff has not demonstrated that it has standing to pursue its claim for trespass to components, and the Undersigned recommends that the motion to dismiss be **GRANTED** as to that claim.

### III. Theft or Criminal Conversion (Count IV)

In Count IV of its Third Amended Complaint, Plaintiff alleges that it owns a right to license its railroad property to third parties for various purposes, including the installation of telecommunication equipment, and that Defendant knowingly and intentionally exerted unauthorized control over the railroad property and licensing rights by making its cable installations on Plaintiff's property without Plaintiff's permission. [Dkt. 210 at 43-44.] In the

instant motion, Defendant contends that Plaintiff lacks standing to assert this claim where it holds only an easement because "it has shown no 'possessory interest in the subsurface or air above its tracks.'"  [Dkt. 639 at 11 (quoting Dkt. 607 at 21).]  In response, Plaintiff argues that, under Indiana law, railroad easements include the right to install fiber optic cables.  [Dkt. 655 at 9.]

### A.  Law of the Case

Plaintiff begins its response brief by asking the Court to reconsider Judge Magnus-Stinson's ruling on the scope of Plaintiff's easements.  [Dkt. 655 at 4.]  As Defendant points out in its reply brief, such an affirmative request must be brought in its own motion, "not contained within a brief, response, or reply to a previously filed motion."  S.D. Ind. L.R. 7-1(a).  However, even if brought properly, Plaintiff's request would not be well taken.  "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022).  Reconsideration is only proper upon the presentation of newly discovered evidence or where a "movant points to evidence in the record that clearly establishes a manifest error of law or fact."  *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996).  A "manifest error" is the "wholesale disregard, misapplication, or failure to recognize controlling precedent."  *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

Plaintiff contends that Judge Magnus-Stinson made a manifest error of law when she "failed to engage with" the cases cited by Plaintiff, and Plaintiff even goes so far as state that "[t]he message sent by Judge Magnus-Stinson's order . . . is that, until a trespasser causes a derailment, a crossing accident, or some other demonstrable damage to railroad property, employees, or the public, the railroad has no power to stop the trespasser from doing whatever it

wants with the subsurface and aerial space on the railroad's easement." [Dkt. 655 at 5-6.] Plaintiff seemingly ignores the fact that Judge Magnus-Stinson considered each case thoroughly in her Order on Plaintiff's Motion to Modify the Court's Summary Judgment Order to Allow Interlocutory Review, [Dkt. 632 at 11-12]. In fact, Judge Magnus-Stinson addressed an almost identical statement to the one now made by Plaintiff in that Order. *Compare* [Dkt. 632 at 8 n.2.] *with* [Dkt. 655 at 6.] As will be discussed more thoroughly below, there is **no** Indiana precedent precisely apposite to the instant matter, and the existing precedent supports Judge Magnus-Stinson's conclusions. Judge Magnus-Stinson did not exercise a "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto*, 224 F.3d at 606. Accordingly, a reconsideration of Judge Magnus-Stinson's ruling on the scope of Plaintiff's easements is not appropriate.

### B. Plaintiff's Arguments

Plaintiff argues that even if Judge Magnus-Stinson's ruling stands, that ruling does not address Plaintiff's theft claim and that "[a]s a matter of Indiana law, 'railroad companies in Indiana holding right-of-way easements for railroad purposes have the legal right to license the use of their railroad corridor for the purpose of installing fiber optic communication lines.'" [Dkt. 655 at 7-8] (quoting *Hynek v. MCI World Commc'ns, Inc.*, 202 F. Supp. 2d 831, 832 (N.D. Ind. 2002)). Indeed, in its response to Defendant's Motion to Dismiss, [Dkt. 655], Plaintiff relies almost exclusively on *Hynek* and its interpretation of Indiana law to support its claim that Plaintiff holds licensing rights for the laying and installation of cable along its rail easements. As a non-precedential district court opinion, *Hynek* is a slender reed upon which Plaintiff attempts to rest the weight of its claim. Indeed, although *Hynek* is over twenty years old, the Undersigned has located only one citing reference to it in an Indiana federal or state court: a passing mention

20

in *Schmitt v. United States*, 2003 WL 21057368 (S.D. Ind. Mar. 5, 2003), an unreported opinion discussing rail-to-trail conversions. More importantly, however, while the holding of *Hynek* does lend support to Plaintiff's position, for the reasons set forth below, the Undersigned respectfully disagrees with that holding.

### 1.  History of Railroad Easements

Given the absence of recent and binding apposite authority addressing the scope of railroad easements under Indiana law,[13] an examination of the history of rail easements and the law applicable to them is in order. Railroad easements are most typically the product of mid-to-late 1800s negotiations between railroad companies and private landowners. *See* 2 Howe et al., *The American People: Creating a Nation and a Society* 618 (Gary B. Nash & Julie Roy Jeffreys eds., 4th ed. 1998); Robert W. Swenson, *Railroad Land Grants: A Chapter in Public Land Law*, 5 Utah L. Rev. 456, 456-59 (1957); Danaya C. Wright & Jeffrey L. Hester, *Pipes, Wires, and*

---

[13] Judge Magnus-Stinson previously ruled that Indiana law applies:

> A federal court sitting in diversity, as this Court does, must apply the choice of law provisions of the forum state. *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Because the district court's subject matter jurisdiction was based on diversity, the forum state's choice-of-law rules determine the applicable substantive law."). The parties appear to agree that Indiana law applies to the claims related to Zayo's actions in Indiana. [*See, e.g.*, Filing No. 428 at 16-20 and Filing No. 482 at 18-25 (parties addressing trespass to land claims related to Indiana tracks under Indiana law and trespass claims related to Illinois tracks under Illinois law).] Absent a disagreement, the Court will apply Indiana law to claims related to sites in Indiana. *Mass. Bay Ins. Co. v. Vic Koenig Leasing*, 136 F.3d 1116, 1120 (7th Cir. 1998); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits…. Courts do not worry about conflict of laws unless the parties disagree on which state's law applies. We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them).").

[Dkt. 607 at 15.]

*Bicycles: Utility Licenses and the Shifting Scope of Railroad Easements from the Nineteenth to the Twenty-First Centuries*, 27 Ecology L.Q. 351, 365-67.  In some instances, the landowners would willingly transfer a tract in fee.  Wright & Hester, *supra*, at 368-70.  In other instances, the landlords would challenge the railroads, leading eventually to takings through formal condemnation proceedings.  *Id.* at 370-72; Danaya C. Wright, *Private Rights and Public Ways: Property Disputes and Rails-to-Trails in Indiana*, 30 Ind. L. Rev. 723, 725.  Having grown disenchanted with the railroads, certain states reduced their condemnation powers under state legislation in the late nineteenth and early twentieth centuries.  Wright & Hester, *supra*, at 374 n.92.  Indiana was one such state, reducing the railroads' authority to condemn corridor land to easements, rather than fee simple, in 1905.  *Id.*; *see also* 1905 Ind. Acts ch. 48 § 1.

What resulted was a variety of deeds ambiguously describing the rights conveyed to railroads.  *See* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land*, P 1.06[2][d], at 1-47, 1-48 (rev. ed. 1995); *see also* Wright, *supra*, at 725.  This variety is simplified into categories of fee interests and easement interests, *see* Wright & Hester, *supra*, at 376-79; *Great N. Ry. Co. v. United States*, 315 U.S. 262 (1942), which is borne out by the evidence of record in this case. *See generally* [Dkt. 466, Dkt. 675.]  Naturally, few issues arise when a railroad establishes ownership in fee, but courts vary on their treatment of railroad rights grounded in easement.

### 2.  Indiana Railroad Easement Law

Generally, under Indiana law, an easement acquired by a railroad company is charged with a public use for railroad purposes.  *See City of Valparaiso v. Chicago & G. T. Ry. Co.*, 123 Ind. 467, 24 N.E. 249 (1890) (land held by a railroad corporation for a right-of-way and for purposes of depots is dedicated to public use); *Bennett v. Lake Erie & W.R. Co.*, 74 Ind. App.

22

156, 127 N.E. 777 (1920). In the early days of rail travel, the Indiana Supreme Court determined that "a railway company, after having acquired the right of way for its road, is entitled to the exclusive possession of the strip of land over which its right of way extends, and stands to adjoining proprietors in the common relation existing between landed proprietors bordering upon each other." *Pittsburgh, C. & St. L. Ry. Co. v. Jones*, 86 Ind. 496 (1882) (citing *Williams v. New Albany & S.R. Co.*, 5 Ind. 111 (1854)). This sentiment of railroad easements maintaining elevated rights when compared to other easements and an exclusive, perpetual nature was echoed by the United States Supreme Court at the time. *See W. Union Tel. Co. v. Pennsylvania R. Co.*, 195 U.S. 540, 570 (1904) (A railroad right of way "is more than a mere right of passage. It is more than an easement."); *Territory of New Mexico v. U.S. Tr. Co of New York*, 172 U.S. 171, 183 (1898) ("[I]f it may not be insisted that the fee was granted, surely more than an ordinary easement was granted,—one having the attributes of the fee, perpetuity and exclusive use and possession.").

Despite this early recognition of the unique nature of railroad easements, Indiana courts soon began to draw distinctions between railroad easement and fee holdings. Notably, a railroad company's right to make use of their easement must be incidental to the "construction, repair or operation of its railroad." *Julien v. Woodsmall*, 82 Ind. 568 (1882)[14] (holding that a railroad has no right to cut ice from its right of way; that right belongs to the owner of the fee); *see also Bennett v. Lake Erie & W.R. Co.*, 74 Ind. App. 156, 127 N.E. 777 (1920) (mentioning a statutory

---

[14] The Undersigned finds the following sentence from *Julien* to be particularly enlightening: "It is plain, then, that, even if the [trespasser] were acting under a license from the railroad company, he could not thereby be authorized to enter and take the ice for his own use, and certainly the right of the railroad company could not protect him, claiming no license, from liability to the owner of the fee for an act which that company could not authorize." 82 Ind. at 571-72.

power of railroads to "erect and maintain all building and station facilities necessary for efficient service to the public").

Importantly, while the servient landowner cannot interfere with the use of a right-of-way easement held by a railroad company, *see Cairo, V. & C. Ry. Co. v. Brevoort*, 62 F. 129 (C.C.D. Ind. 1894), "[t]he owner of the fee remains the owner of springs, streams, minerals, and the like; for all that he grants is an easement.  The owner cannot interfere with the free use of the right of way; but, subject to this use, he may make all lawful use of the land." *Smith v. Holloway*, 124 Ind. 329, 24 N.E. 886 (1890); *see also, Cincinnati, C., C. & St. L. Ry. Co. v. Simpson*, 104 N.E. 301, 306 (Ind. 1914) ("It is the settled law that, where an easement for a right of way is granted a railway company across lands of another, the owner of the fee remains the owner of all mineral in the land, and may make all lawful use of the land so long as he does not interfere with the free use of the right of way"); *Consumers' Gas Tr. Co. v. Am. Plate Glass Co.*, 162 Ind. 393, 68 N.E. 1020 (1903) (recognizing that a gas company, standing in the position of an owner in fee, maintained superior interests in an oil well lying partially beneath a railroad's right-of-way).  Thus, Indiana law expressly distinguishes between the rights afforded a railroad holder in fee and those afforded a railroad holding an easement interest.

### 3.  The Hynek Case

As noted above, Plaintiff's argument relies heavily on the holding in *Hynek*, 202 F. Supp. 2d at 831.  *Hynek* involved a dispute between plaintiff landowners and defendant railroad and communication companies.  *Id.*  For purposes of the court's ruling, it was assumed that the defendant railroad companies held an easement interest and that the plaintiff landowners held the fee interest in the land in question.  *Id.*  The defendant railroad companies had granted licenses to the defendant communication companies to install fiber-optic cable within the railroad

24

companies' rail corridor. *Id.* The issue before the court was whether the railroads' easements permitted them to license the use of the rail corridor by the communication companies without having to compensate the landowners. *Id.* Ultimately, the court determined that the plaintiffs failed to state a claim as a matter of law against the railroad defendants because the railroads' easements gave them a right to grant the licenses in question. *Id.* at 839. In the Undersigned's view, as explained below, in reaching its conclusion the court in *Hynek* considered only a small sliver of Indiana rail easement law and gave unwarranted weight to non-Indiana precedent.

a. Hynek*'s Application of Indiana Law*

As the *Hynek* court pointed out, "Indiana courts have not directly addressed th[e] increasingly important legal issue" of the nature of the rights granted with a railroad easement. *Id.* at 834. Thus, the court in *Hynek* looked to several Indiana cases to draw an inference as to how an Indiana state court would rule on the issue.

The *Hynek* court began with *Consumers' Gas*, from which it gleaned the following uncontroversial principles: "1) that a railroad easement is 'so far exclusive that the gas company (servient holder of the easement) was not authorized to enter upon the right of way for the purpose of drilling a gas well . . .'; [and] 2) the scope of a railroad easement . . . is confined to the railroad purposes of a right of way." *Hynek*, 202 F. Supp. 2d at 836 (quoting *Consumers' Gas Tr. Co.*, 68 N.E. at 1021). After all, drilling a gas well would almost certainly interfere with the safe operation of a rail line in close proximity,[15] and—as discussed above—Indiana law recognizes a "railroad purposes" use restriction. However, unlike the *Hynek* court, the Undersigned does not read *Consumers' Gas* to support a broad finding that the scope of a railroad easement includes

---

[15] It goes without saying that the footprint and impact of gas well installations in the early 1900s (the period during which *Consumers' Gas Trust* was decided) is quite different from the footprint and impact of the aerial and subsurface installation of modern fiber optic cable lines.

the right to install any form of communications line.  *See id.* at 835-36 ("With regard to the scope of the railroad easement, as noted in the opinion, *Consumers' Gas Trust* confirms that such an easement includes the use of communication lines i.e. 'a line of telegraph poles since its entry.'") (quoting *Consumers' Gas Tr. Co.*, 68 N.E. at 1021).  Rather, the Undersigned understands the language quoted by *Hynek* as describing the extent of that specific railroad company's occupation of the land.[16]  There is no other mention of telegraph or any other communication lines, and certainly no conclusion that such lines are included within a railroad's easement.

The Undersigned also finds the *Hynek* court's other inferences taken from Indiana cases to be misplaced.  First, the court turned to *Ritz v. Indiana & Ohio R.R.*, 632 N.E.2d 769, 776 (Ind. Ct. App. 1994).  *Ritz* involved a landowner—against whom an eminent domain action was brought—who filed a third-party complaint against a railroad and utility companies.  *Id.* at 771. The section cited by *Hynek* discussed the landowner's trespass claims against the railroad and utility companies for cutting down trees and placing a pole within a county's right-of-way.  *Id.* at 775-76.  There, the *Ritz* court recognized Ind. Code § 8-20-1-28 as the statute authorizing "public and municipally owned utilities to construct, operate, and maintain their facilities upon, along,

---

[16] A reading of the quote in context illustrates this point:

> The railroad was built by the Cincinnati, Wabash & Michigan Railway Company about 1871. The right of way through the tract of land mentioned was fenced by said company about the year 1877, and it has since maintained said fences.  Its entry upon the land was made without color of title, and over the protest of the holders of the record title.  The landowners have not sought to have their damages assessed.  The company has occupied the land with a single track railroad and a line of telegraph poles since its entry.  Its possession has been continued without interruption since that time, and such possession appears to have been hostile.

*Consumers' Gas Tr. Co.*, 68 N.E. at 1021. The *Consumer's Gas Trust* court was reciting facts relevant to the case's adverse possession analysis, **not** acknowledging a property right.

26

under, and across any of the public roads, highways and waters outside of municipalities." *Id.* at 775 (citing Ind. Code § 8-20-1-28). "Moreover, a utility may utilize a public right of way without the consent of the servient landowner who claims that such a use is an additional burden and servitude to the fee which is subject to the easement for highway purposes." *Id.* (citing *Fox v. Ohio Val. Gas Corp.*, 250 Ind. 111, 235 N.E.2d 168 (1968); *Deetz v. N. Indiana Fuel & Light Co.*, 545 N.E.2d 1103, 1105 (Ind. Ct. App. 1989)).

The court then stated that the same "analysis applies with equal force to [the landowner's] claims of trespass and taking in the area referred to by the parties as the railroad's right-of-way," noting that "[n]o additional burden is cast upon the fee beyond that which was contemplated and for in the original taking." *Id.* at 775-76 (emphasis added). Not mentioning any of this analysis, the *Hynek* court found that a lack of dispute in the *Ritz* record as to whether a railroad had a right-of-way or had permitted utility companies to utilize the railroad's easement "clearly" implied that Indiana law permits **railroads** to allow utility companies to make use of railroad easements. *Hynek*, 202 F. Supp. 2d at 836. This sentiment is not supported by a full reading of *Ritz*, nor is it supported by other Indiana cases. It is not the case that **railroads** can allow utility companies to make use of their easements, but rather that there are statutes and laws authorizing the utility companies to do so **in their own right** when the easement lies upon a public right-of-way. There is no question that a railroad company could remove trees from their easement that are interfering with their right to construct, maintain, and operate a railroad. *See Julien*, 82 Ind. at 571. *Hynek*'s misinterpretation is that a railroad's right to utilize its easements for railroad purposes permits the railroad to license broadly even those rights which remain with the servient landowner. *Ritz* does not recognize such a power, nor does any other Indiana case.

27

*Hynek* also discusses *Calumet Nat. Bank v. AT&T*, 682 N.E.2d 785 (Ind. 1997). *Calumet* involved an action by a bank, acting as trustee, against a telecommunication company. *Id.* at 787. The telecommunication company had entered into an agreement with a railroad to install and operate cable along the railroad's right-of-way. *Id.* Importantly, the railroad had abandoned the rail line running upon the right-of-way nearly two years before the agreement was made. *Id.* An amendment to the agreement included the addition of a six-mile segment which lay adjacent to property acquired by the bank. *Id.* The bank successfully quieted title in the abandoned right-of-way as to the railroad and sued the telecommunication company for trespass. *Id.* The Indiana Supreme Court ordered the trial court to grant summary judgment in favor of the bank, holding that—after the abandonment—the railroad no longer held an interest in the right-of-way which it could license to the telecommunication company. *Id.* at 791.

As the *Hynek* court observed, the "decision does not discuss to what extent a railroad may license the use of the easement prior to its abandonment." *Hynek*, 202 F. Supp. 2d at 837. Still, the *Hynek* court found persuasive the *Calumet* court's analysis of a railroad's easement interest. The *Hynek* court reasoned that the court in *Calumet* would not have devoted so much time to discussing the nature of the interest owned by the railroad, the extinguishment and timing of the abandonment of the easement, and the validity of the railroad's license to a fiber-optic cable company "had the court simply determined that the railroad did not have the right to license that use prior to any abandonment." *Id.*

To begin, the length of a court's analysis does not necessarily directly correlate to the merit of the argument being discussed. In fact, courts often spend more time addressing less meritorious arguments than they do more meritorious arguments. Moreover, *Hynek*'s reasoning presupposes that the *Calumet* court would have had an easier time determining whether the right

to grant a license to lay fiber-optic cable was within the scope of a railroad easement.  As the law detailed above makes clear, this was an unsettled question.  The court may have seen a lengthy discussion of easement abandonment and extinguishment—for which statutes existed on the books—as preferable to the creation of a new rule of law.  If anything, the depth of discussion indicates that the issue has not been decided. The court's silence cannot be taken as support for a theory wholly unaddressed by the opinion.

   b.  Hynek*'s Treatment of Non-Indiana Precedent*

   *Hynek*'s review of Indiana law only formed part of its analysis.  Rather than directly apply Indiana law, the *Hynek* court instead formulated a three-part analysis based on three non-Indiana cases dealing with fiber-optic cable lines and railroad easements:  *Mellon v. S. Pac. Transp. Co.*, 750 F. Supp. 226 (W.D. Tex. 1990); *Davis v. MCI Telecommunications Corp.*, 606 So. 2d 734 (Fla. Dist. Ct. App. 1992); and *Buhl v. U.S. Sprint Commc'ns Co.*, 840 S.W.2d 904 (Tenn. 1992). Though factually similar, these cases each rely on laws and policies unrecognized by the Indiana courts or legislature.

   In *Mellon*, the Western District of Texas granted summary judgment upon reconsideration for the defendant railroad company.  *Mellon*, 750 F. Supp. at 228.  At issue was whether the installation of fiber-optic cable thirty-six to forty inches beneath the surface of a railroad right-of-way easement constituted an additional burden on the plaintiff servient landowner.  *Id.*  The court accepted three arguments: 1) the "incidental use doctrine" permits railways to grant third parties an easement in the railway's right-of-way without entitling the servient landowner to compensation; 2) "a telephone company, as a legislatively preferred class of utility, has the power to condemn privately owned property under" a (now repealed) Texas statute; and 3) Texas state law regulating railroads is preempted by Federal law.  *Id.* at 229-32.

The acceptance of the first two arguments hinged on an application of Texas case law expanding the statutory use of the term "telegraph" to include underground communications cables. *Id.* No such precedent exists in Indiana. The Texas court's discussion of preemption summarily concludes that since there is federal law regulating trains themselves but no federal law governing railroad easements, then the field must be implicitly preempted. *Id.* at 233-32. Judge Magnus-Stinson already considered and rejected the preemption argument in this case. She reasoned that the preemption cases relied upon by Plaintiff "all involved situations where the allegedly unauthorized act either rendered the property unusable by the railroad or it was unclear whether that was the case," [Dkt. 607 at 24], and that, "in a case much closer to this one, a federal court found that the ICCTA did not preempt a state law condemnation claim related to an aerial installation above a railroad track that did not interfere with the railroad's use of its tracks and equipment." *Id.* at 25. Plaintiff has articulated no proper basis to contradict Judge Magnus-Stinson's well-reasoned conclusions in that regard.

In *Davis*, the Florida District Court of Appeal affirmed the dismissal of the plaintiff property owners' complaint against a communications company for laying fiber-optic cable along a CSX railroad right of way. 606 So. 2d at 734-35, 739. The court's determination rested almost entirely on an application of Florida statutes and case law. *Id.* at 734-39. The exception was a conclusory finding that the cables were buried three feet deep, less than an inch in diameter, used for telephone and other telecommunication purposes, and did not impose a greater obstruction than did the former railroad lines. *Id.* at 739.

In *Buhl*, the Supreme Court of Tennessee remanded the Tennessee Court of Appeals' dismissal of the plaintiff landowners' claims that the defendant telephone company's installation of telephone cable within a railroad's existing right-of-way was an eminent domain taking from

the landowner. *Buhl*, 840 S.W.2d at 904. In its application of Tennessee law, the court concluded "that since the telephone cable installed by [the telephone company was] not used by [the railroad] in the construction, maintenance, or operation of its railroad upon and across the encumbered property, its construction constituted the taking of an interest in plaintiffs' respective tracts within the meaning of the law of eminent domain." *Id.* at 911. Key to this conclusion was a long-standing Tennessee case recognizing the installation of telegraph lines for purely commercial use—as opposed to railroad-related use—as an additional burden on the underlying fee. *Id.* at 912 (citing *W. Union Tel. Co. v. Nashville, C. & St. L. Ry. Co.*, 145 Tenn. 85, 237 S.W. 64 (1922)).

Each of these opinions demonstrates how rail easement law differs across state lines, requiring a state-specific analysis.[17] Ultimately, the property rights of railroads—so far as they are addressed in this Report and Recommendation—are a product of state law, and the Undersigned must therefore apply the law of Indiana, not that of Texas, Florida, or Tennessee. *See Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001).[18] Nevertheless, the *Hynek* court made its decision based on three criteria derived from these non-Indiana cases: "1) the extent of the burden that the additional fiber optical cable places upon the railroad easement; . . . 2) whether the fiber optic cable can be considered as necessary or for the benefit of the railroad's purpose or whether it is purely for nonrailroad commercial purposes; . . . and 3) whether the placement of such a fiber-optic cable line is permitted under statutory law." *Hynek*, 202 F. Supp. 2d at 834-35, 838-39 (internal citations omitted). Despite the absence of a legal nexus, the *Hynek* court

---

[17] This point is perhaps best demonstrated by the *Buhl* court's holding, which was opposite to those made by the *Davis*, *Mellon*, and *Hynek* courts.

[18] Plaintiff has voiced its agreement in this regard: "Easements that are 'creatures of Indiana law' are governed by Indiana case law." [Dkt. 655 at 9 n.5.]

ultimately found *Mellon*'s reasoning persuasive as to the first two principles. *Id.* at 838-39.  In doing so, the court concluded that "the placement of the cable does not burden the subservient estate . . . beyond the current burden," and "the cable was an incidental use which was not inconsistent with railroad uses," *id.* at 839, and therefore it was within the railroads' rights to grant the licenses for it.

c. *Lack of Statutory Support for* Hynek*'s Conclusion*

As for the final principle, the *Hynek* court concluded that the Indiana Abandoned Right-of-Way Act, Ind. Code § 32-23-11-1 *et seq.*, evinced a statutory scheme supporting railroads' licensing to fiber-optic cable companies. *Id.* at 837, 839.  The Undersigned disagrees that the Act authorized or provided support for such rights.  Ind. Code § 32-23-11-10 provides that the abandonment of a railroad's right-of-way results in the vesting of the railroad's interest in the servient landowner.  However, in the event of an abandonment, Ind. Code § 32-23-11-11(a) forbids the divestment of, *inter alia*, a valid fiber-optic easement, license, or legal occupancy if the railroad granted the easement before the date of abandonment.

It is true, then, that the Indiana legislature has recognized that there are circumstances where a railroad may grant a fiber-optic easement, license, or legal occupancy.  For example, a landowner's easement may specifically convey a right to lay fiber-optic cables.  However, the statute itself does not create a right to grant such an easement; it simply recognizes that such an easement may exist.  Moreover, the statute explicitly states that it does not "[l]imit the right of the owner of a right-of-way fee to demand compensation from a railroad or a utility for the value of an interest taken and used or occupied after abandonment."  In other words, the legislature recognizes fiber-optic licenses in a right-of-way as a compensable taking.

This understanding is supported by the Indiana legislature's 1975 repeal of Ind. Code § 8-1-21-1. That section stated:

> Any railroad company . . . owning or operating . . . railroads in this state, is hereby authorized and empowered to construct, maintain, own, and operate lines of telegraph upon and along the route and right-of-way of the railroad or railroads owned or operated by it . . . for its own and also for public or commercial uses . . . and to charge, collect, and receive reasonable and customary rates for transmission of telegrams thereupon.

Ind. Code § 8-1-21-1.  Rather than revise the statute to replace telegraph lines with modern communication conduits, the legislature chose to repeal it in its entirety.  As discussed in more depth below, the benefit of authorizing railroads to utilize their rights-of-way for communications lines has run its course.  The legislature recognized this five decades ago when it revoked that authorization.  The legislature may not have retroactively divested railroads of their prior grants to communications companies—a protection recognized by Ind. Code § 32-23-11-11(a)—but it voided the vehicle that would have permitted future grants via statute.

In summary, *Hynek*'s conclusion impermissibly draws inspiration from courts applying foreign law which contradicts existing Indiana precent.  There is nothing from the body of Indiana railroad law confirming that a railroad company—holding title in easement only—maintains the right to license or restrict others from utilizing the surface, subsurface, or air above their easement for purposes which do not hinder the construction, maintenance, or operation of the railroad.  Ultimately, the evidence in this case has not shown that Defendant's utilization of the subsurface and air above Plaintiff's easements has hindered Plaintiff's construction, maintenance, or operation of their railroad.  If any rights have been infringed, they are the rights of the servient landowners, and those landowners may exercise their rights as they wish.

### 4. *Plaintiff's Additional Arguments*

In addition to relying on *Hynek*, in its response to the instant motion, Plaintiff makes a few additional arguments, each of which is addressed, in turn, below.[19]

#### a. Waiver

First, Plaintiff argues that Defendant's position that Plaintiff has no licensing rights "cannot be squared with arguments that [Defendant] successfully advanced earlier in the litigation or its ordinary-course-of-business conduct." [Dkt. 655 at 10.] Specifically, Plaintiff contends that Defendant cannot now claim no licensing rights exist after successfully arguing that all counts should be dismissed for sites where Defendant had entered into a licensing agreement with Plaintiff. *Id.* at 11.

The use of a license as a defense and the nonexistence of the underlying rights are not mutually exclusive. Defendant paid for Plaintiff's authorization as to certain sites, so it should come as no surprise that Defendant relied on that authorization as a defense. Indeed, Defendant notes that the licensing agreements often included an express disclaimer as to the soundness of the rights conveyed and are thus "only promises from [Plaintiff] that it will not sue, even if [Plaintiff's] claim to sue would be frivolous." [Dkt. 665 at 7-8]. Ultimately, the Undersigned agrees with Defendant's characterization of the licenses entered into between the parties as

---

[19] Plaintiff makes the argument in its response brief that the Indiana criminal statute upon which it relies, Ind. Code § 35-31.5-2-253(b), recognizes unauthorized control over not only possessory interests, but also proprietary interests. [Dkt. 655 at 10.] Therefore, Plaintiff reasons, "Judge Magnus-Stinson's ruling that [Plaintiff] 'has not shown that its ***possessory*** interest . . . was affected by [Defendant]'s installations,' does not control whether [Plaintiff] can show [Defendant] stole or converted its ***proprietary*** interest in its distinct licensing rights." *Id.* (emphasis in the original). Ultimately, this argument fails because—as explained above—Plaintiff has neither a possessory nor a proprietary interest in licensing cable installation.

34

simply "a waiver to [Plaintiff's] claims in this case, irrespective of whether those claims were ever in fact legitimate." *See id.* at 7.

    *b.  Public Policy*

    Plaintiff also argues in its response brief that finding "that a railroad easement does not include the right to install, operate, and maintain fiber optic cable lines and to license those rights" will have "far-reaching negative consequences." [Dkt. 655 at 12.]  Specifically, Plaintiff contends that such a finding will result in diminished railroad integrity and safety and higher transaction costs and lengthier negotiations that will impair the growth of the tele-communications industry.  *Id.* at 12-14. Judge Magnus-Stinson considered the alleged effects on safety in her Order on Plaintiff's Motion to Modify the Court's Summary Judgment Order to Allow Interlocutory Review.  [Dkt. 632.]  There, Judge Magnus-Stinson noted that had Plaintiff "established that its easements were exclusive or presented any evidence that anyone had actually damaged its property, it may have had viable trespass and rent claims for sites for which it holds easements." *Id.* at 8 n.2.  Instead, the record shows that Plaintiff has failed to establish that it "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 338-39.  The lack of admissible evidence supporting Plaintiff's railroad integrity and safety contentions as to each site makes Plaintiff's argument unpersuasive.

    As for Plaintiff's contentions regarding higher transaction costs and lengthier negotiations, the Undersigned is not compelled to go against long-standing Indiana precedent in the interest of unsubstantiated concerns.  Although the Indiana legislature was initially supportive of growing communication lines alongside the railroads, that no longer appears to be the case.  As discussed above, the Indiana legislature had the perfect opportunity to expand, or at

least modernize, what railroads were permitted to construct within their rights-of-way but instead

chose to repeal the existing statute granting such permission in its entirety.  Moreover, while the

benefit of fiber-optic cables is not lost on the Undersigned, the improvement in tele-

communications since their implementation is not quite the technological leap this country

witnessed with the telegraph.  Before the telegraph, communication over long distances was

achieved through beacons, smoke signals, semaphore, and the like; when conditions restricted

visibility, it was horses and pigeons.  The telegraph made all these methods obsolete, allowing

one to transmit messages over long distances in less than a day, independent of the weather.

Railroads especially benefited from this huge technological leap, as operators could be quickly

alerted of rail traffic conditions with an on-site telegraph device.

In contrast, fiber-optic cables augment, rather than replace, existing technologies.

Without fiber-optic cables, communication may be slower—but only as measured in seconds and

bytes, not days and words.  The argument that granting railroads the right to license the

installation of telecommunications lines is essential to the growth of the telecommunications

industry simply carries less weight than it did over a century ago.  This is especially true

considering the protections afforded by Ind. Code § 32-23-11-11(a) for pre-existing grants.  In

any event, it is telling that Defendant—a company that would bear the burden of the foretold

costs—chose not to address the argument in their reply.

In summary, Plaintiff has not shown that Defendant invaded Plaintiff's property rights.

There is no Indiana law recognizing the right of a railroad, holding title in easement only, to

install or license the installation of fiber optic cables. Plaintiff's other arguments are likewise

unavailing. Accordingly, Plaintiff has not demonstrated that it has standing to pursue its claim for

theft or criminal conversion for those sites held in easement only, and the Undersigned recommends that the motion to dismiss be **GRANTED** as to that claim.

### IV. Conclusion

For all of the reasons set forth above, the Undersigned **RECOMMENDS** that Defendant Zayo Group, LLC's Partial Motion to Dismiss Count VI and Count IV Under Rule 12(B)(1), [Dkt. 637], be **GRANTED** in its entirety.

Any objections to this Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

SO ORDERED.

Dated:  22 JAN 2025

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.